UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:18-cr-00099-DRL-SLC |
| ) | |
| COREY P. BRIGHT ) | |

**REPORT AND RECOMMENDATION**

Before the Court is a motion to suppress evidence filed by Defendant Corey P. Bright. (ECF 45). Defendant seeks to suppress statements he made to investigators on June 3, 2018, and June 4, 2018, alleging that both sets of statements were elicited by means of coercion and custodial interrogations, performed without *Miranda* warnings. (*Id.*)

*A. Background*

On November 28, 2018, Defendant was indicted for allegedly possessing a firearm as a felon and for possessing an unregistered firearm. (ECF 1; *see also* ECF 51). He was subsequently arrested on December 28, 2018. Defendant then filed the pending motion to suppress on December 31, 2019 (ECF 45), to which the Government responded on January 10, 2020 (ECF 47). On January 1, 2020, the District Judge referred this matter to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b). (ECF 46).

On January 28, 2020, the Court conducted an evidentiary hearing with respect to the motion to suppress.[1] (ECF 49). On May 6, 2020, Defendant filed a post-hearing brief in support of his motion (ECF 67), to which the Government responded on June 3, 2020 (ECF 68).

---

[1] The Court will refer to the transcript of the hearing (ECF 64) as "Tr. __."

Defendant filed a reply on June 29, 2020. (ECF 69). Accordingly, the matter is fully briefed and ripe for adjudication. After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Defendant's motion to suppress (ECF 45) be DENIED.

### B. *Findings of Fact*

At the evidentiary hearing, the Government offered the testimony of Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATFE") Task Force Officer ("TFO") Caleb Anderson, and Fort Wayne Police Department ("FWPD") Detective Larry Tague. (ECF 50). At the time of the hearing, Detective Tague had thirty-one years of law enforcement experience, including twenty-five years with the FWPD. (Tr. 5-6). TFO Anderson had thirteen years of experience with the Indiana State Police and had worked in the Special Investigations Unit before being assigned as a TFO with the ATFE approximately four years before the hearing. (Tr. 25-26). Both testified that they had training and experience identifying people under the influence of narcotics and alcohol. (Tr. 22, 32-33). The Government also submitted into evidence, digital recordings of the two interviews in question. (*See* ECF 50).[2] Defendant offered no other testimony or evidence. The testimony of both officers was not contested in any meaningful way at the hearing and was largely consistent with the audio recordings. As such, I FIND their testimony to be entirely credible.

On June 2, 2018, Detective Tague was dispatched to St. Joseph Hospital to speak with a shooting victim later identified as Defendant. (Tr. 6). Detective Tague spoke with Defendant who stated that he was assisting a friend, Michelle Novak, repossess a car. (Tr. 8). While cleaning out the car in an alley, Defendant allegedly found a sawed-off shotgun in the trunk.

---

[2] The recording of each interview was admitted as Government's Exhibit 1. (ECF 50; Tr. 31). When referring to the recordings, the Court will cite to the interviews and the relevant time frames as the "June 3, 2018, Interview at 00:00-00:00" and the "June 4, 2018, Interview at 00:00-00:00" respectively.

(*Id.*). When attempting to unload it, Defendant stated he accidentally discharged the gun, shooting himself in the foot. (*Id.*).

At some point though, officers who had responded to Michelle Novak's home informed Detective Tague that they had found a trail of blood leading from the basement of the home to the back door. (Tr. 8-9). Detective Tague also executed a search warrant at the home where he saw a sawed-off shotgun lying on the floor in the basement, what appeared to be an impact site on the floor, blood, and shotgun wadding. (Tr. 9, 19). Detective Tague later contacted TFO Anderson to inform him of a possible "possession of a sawed-off shotgun charge" against Defendant. (Tr. 9, 17).

The following day, June 3, 2018, Detective Tague accompanied TFO Anderson to Lutheran Hospital to interview Defendant. (Tr. 10, 28). Both were in plain clothes at the time of the interview. (Tr. 10, 30). While each were armed, at no point during the interview did either officer unholster his weapon or raise his voice. (Tr. 10, 11, 30; *see also* June 3, 2018, Interview). Aside from the officers, Defendant was alone in the hospital room. TFO Anderson conducted most of the interview, sitting in a chair next to Defendant's hospital bed, while Detective Tague stood by the door. (Tr. 11, 29). Detective Tague testified that he could not remember whether the door was open or closed, but TFO Anderson testified that it was closed. (Tr. 12, 29). Defendant was not physically restrained to the hospital bed and there was no police guard outside of the room. (Tr. 11-12, 29, 30). While both officers testified that there was no law enforcement keeping Defendant in the room, they were unsure whether his injury physically prevented him from leaving. (Tr. 14, 50).[3] Neither officer gave Defendant a *Miranda* warning. (Tr. 13, 30-31). Both further testified that Defendant appeared cognizant, answered their

---

[3] Defendant eventually had his injured leg amputated months after the interviews. (Tr. 14, 38-39).

3

questions coherently, remembered details and names, and did not otherwise appear to be under the influence of any prescribed or unprescribed drugs. (Tr. 21, 34, 38). TFO Anderson also asked Defendant about his drug use, to which Defendant stated that he had been sober for a week. (Tr. 33-34; June 3, 2018, Interview at 20:08-20:20).

As mentioned, much of the June 3, 2018, interview was conducted by TFO Anderson. TFO Anderson was previously aware of Defendant as a victim of multiple attacks by another individual under investigation, who was himself arrested about a month after the interview. (Tr. 27). TFO Anderson was also aware that Defendant was a convicted felon but did not know his full criminal history on June 3, 2018. (Tr. 35). TFO Anderson did, however, know that Defendant had a pending state gun case. (June 3, 2018, Interview at 10:30-10:45). TFO Anderson began the interview by introducing himself and asking if he could pull up a chair, to which Defendant agreed. (Tr. 29; June 3, 2018, Interview at 01:45-03:00). He further asked if Defendant would mind answering some questions. (*Id.*). Defendant initially responded that he did know what there was to talk about but proceeded to answer TFO Anderson's questions. (*Id.*).

Anderson began the interview by asking Defendant whether he was aware of what the ATFE was—to which Defendant stated that he was—before asking him about the sawed-off shotgun. (*Id.*). Defendant relayed substantially the same story that he told to Detective Tague; namely, that he had found the gun in the trunk of a car and accidentally discharged it in an alley while attempting to unload it. (June 3, 2018, Interview at 04:30-08:30). TFO Anderson, though, explained that this story was inconsistent with the evidence at the scene—specifically the gun, blood, and wadding found in the basement—and that he could possibly face five years imprisonment for lying to a federal agent. (June 3, 2018, Interview at 08:30-09:45); *see* 18

U.S.C. § 1001.  Defendant then stated that he went to Michelle Novak's home at her request to "clean out" the home, or help remove people who were staying there, before finding the gun in a closet.  (June 3, 2018, Interview at 09:45-10:45).  He again stated that the gun discharged as he was attempting to unload it.  (*Id.*).  Defendant further stated that he had been at the home about a month prior, when the gun was brought to the house, and that he had handled the gun in the past—moving it within the house—prior to when he shot himself.  (June 3, 2018, Interview at 20:20-24:00).

TFO Anderson eventually explained that he believed that Defendant could be charged for possessing a sawed-off shotgun but that he was primarily concerned with the other individual he was investigating.  (June 3, 2018, Interview at 26:45-32:30; *see also* Tr. 27-28).  He told Defendant, though, that if he was charged, assisting in the investigation of and testifying against that individual could help him at sentencing.  (June 3, 2018, Interview at 26:45-31:15).  But TFO Anderson explained that he was not making any promises, and that any such decision would be made by federal prosecutors.  (June 3, 2018, Interview at 29:30-30:30).  The interview lasted approximately forty-five minutes.  (June 3, 2018, Interview).  Both officers testified that Defendant was not taken into custody following the interview.[4]  (Tr. 12, 40).

On June 4, 2018, TFO Anderson returned with Special Agent Andy Badowski of the ATFE to Lutheran Hospital.  Both TFO Anderson and Special Agent Badowski were in plain clothes and never unholstered their firearms.  (Tr. 37).  Defendant was still not handcuffed or otherwise restrained to his bed, and there was still no guard at his room.  (Tr. 37-38).  TFO Anderson testified that he was unsure whether he left the door open but thought he probably would have shut it.  (Tr. 37).  He further testified that Defendant appeared coherent and able to

---

[4] Detective Tague testified that had Defendant been arrested, he would have been handcuffed to the hospital bed and a guard placed outside his room.  (Tr. 12).

5

answer his questions. (Tr. 38). In fact, when TFO Anderson mistakenly used a wrong name in summarizing what Defendant had told him the prior day, Defendant indicated that it was the wrong name and confirmed the correct name. (June 4, 2018, Interview at 04:15-04:35). Based on the recording, there is no indication that TFO Anderson or Special Agent Badowski ever raised their voices or threatened Defendant. (June 4, 2018, Interview; *see also* Tr. 41).

Between the interviews, TFO Anderson learned that Defendant had an active warrant for possession of a firearm and two prior burglary convictions. (*See* Tr. 16, 19). TFO Anderson asked if Defendant was "good" with him asking a few more questions, before reading Defendant his *Miranda* rights. (June 4, 2018, Interview at 03:30-4:30). When asked he if he had any questions about his rights, he indicated that he did not. (*Id.*). TFO Anderson then recounted substantially the same information from the previous interview and asked about other interactions Defendant had with the subject of his other investigation. He also explained that, after speaking with an AUSA and checking Defendant's criminal history, Defendant qualified as an armed career criminal and faced a potentially longer mandatory sentence. (Tr. 44; June 4, 2018, Interview at 19:55-23:00); *see also* 18 U.S.C. § 924(c). Based on his potentially longer sentence, TFO Anderson and Special Agent Badowski advised Defendant to be honest with them and cooperate with them. (June 4, 2018, Interview at 19:55-23:00). Special Agent Badowski stated that the agents were on Defendant's side but explained again that they could not make any promises to him. (June 4, 2018, Interview at 32:00-33:00). Defendant responded that he knew that TFO Anderson and Special Agent Badowski could not make any promises to him, and that he had "heard it over and over." (*Id.*). TFO Anderson further testified that Defendant was not taken into custody at the end of the interview. (Tr. 40). The interview lasted approximately thirty-five minutes. (June 4, 2018, Interview).

*C. The* Miranda *Standard*

"In the seminal case of *Miranda*, the United States Supreme Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.'" *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 299 (2011)).

*Miranda*, however, does not apply to all statements made to law enforcement, but only those made as a result of "custodial interrogation." *See id*. ("The privilege against self-incrimination is not imperiled by every conversation with the government."). "Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984); *Miranda*, 384 U.S. at 444; *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2016)); *see also Patterson*, 826 F.3d at 454.

"Custody" in the context of *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). As an initial step, the Court is to determine, whether, in light of the "objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. (alteration in original) (internal quotation marks omitted) (first quoting *Stansbury v. California*, 511 U.S. 318 (1994); and then quoting

7

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  Further, in order to so determine, the Court is to examine "all of the circumstances surrounding the interrogation" including but not limited to: (1) its duration, (2) its location, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning.  *See id*. at 509 (listing cases); *Patterson*, 826 F.3d at 455.  Still more factors to consider include:

> whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

*Patterson,* 826 F.3d at 455.  Overall, though, the inquiry revolves around "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes*, 565 U.S. at 509.

### D.  Discussion

Defendant contends that both the June 3 and June 4, 2018, interviews were custodial interrogations.[5]  (ECF 45 ¶ 3(a)).  He further contends that any statements made were the result of coercion, as he "was led to believe that by giving statements that he would receive consideration for the statements and would face no more than 10 years in prison."  (*Id.* ¶ 3(b)).  Still more, he asserts that any statements were made while he was "incapacitated, medicated, and could not leave the presence of the officers."  (*Id.* ¶ 3(c)).  Defendant also asserts that on June 4,

---

[5] The Government, in its response brief also argues that Defendant's statements to Detective Tague on June 2, 2018, were not the result of custodial interrogation.  (ECF 68 at 13-14).  Because Defendant does not raise any arguments as to the June 2, 2018, interview in either his motion or his post-hearing brief, the Court will consider any such argument as waived.  *See United States v. Kirkman*, 567 F.3d 316, 322 (7th Cir. 2019) ("Courts are not in the business of formulating arguments for the parties, it is defense counsel's job to develop suppression arguments in a meaningful way so that the government has an adequate opportunity to respond and the district court to make an informed decision." (citations and internal quotation marks omitted)).

8

2018, he did not "knowingly and fully" waive his *Miranda* rights.  (*Id.* ¶¶ 3(e), 4).  Because each interview was factually distinct, I will address each separately.

*1. June 3, 2018, Interview*

Turning first to the June 3, 2018, interview, the Government does not dispute that Defendant was subject to interrogation.  (ECF 68 at 15).  Therefore, the only dispute is whether Defendant was in custody at the time.  *See Patterson*, 826 F.3d at 454 (observing at the outset that the only issue in dispute was whether Patterson was "in custody" at the time of his interview at the FBI office).  In support of his argument, Defendant primarily attempts to distinguish this case from the Seventh Circuit Court of Appeal's decision in *Stechauner v. Smith*, 852 F.3d 708 (7th Cir. 2017).  (*See* ECF 67 at 5).

In *Stechauner*, the Appellate Court considered on *habeas* review, the un-*Mirandized* statement the petitioner made to police while hospitalized after accidentally shooting himself. 852 F.3d at 715.  There, the Seventh Circuit ultimately denied the petition, finding "reasonable jurists could conclude that Stechauner was not in custody at the hospital."  *Id.* at 716.  In doing so, the Appellate Court noted:

> Stechauner appeared awake and lucid, and had already been treated for the gunshot wound.  Stechauner resisted answering some of the questions about who else had been in the car when the gun had gone off, but generally answered questions about where the gun was.  There were up to three officers in the room at a time, and one of them was in full police uniform.

*Id.* at 715.  The court also cited the relatively short duration of the questioning—about ninety minutes—and the lack any handcuffs, restraints, coercion, deception, or use of force by the police.  *Id.* at 715-16 (citing *United States v. Jamison*, 509 F.3d 623, 632 (4th Cir. 2007) (finding a suspect was not in custody where a suspect was "primarily restrained not by the might of the

9

police, but by his self-inflicted gunshot wound, the medical exigencies it created, and the investigation he initiated")).

Defendant, however, contends that *Stechauner* is distinguishable "because not only was [he] subject to one interview, . . . [he] was interviewed several times over the course of three days, each lasting closer to an hour." (ECF 67 at 6). He also alleges that his ability "to simply terminate the interview and leave was significantly more impaired, as [he] was receiving surgical treatment in between the multiple interviews." (*Id.*). Defendant further seems to contend that the fact the interviews occurred while he was injured was necessarily coercive. (*Id.*).

None of these arguments, though, are persuasive. As an initial matter, it does not necessarily follow that because Defendant was subjected to subsequent interviews that he was in custody or otherwise coerced. In *United States v. Baxter*, for example, the court found that a defendant was never in custody for the purposes of *Miranda* at any relevant point, despite being interviewed three times—including a brief conversation at the site of a bank robbery, a more extensive interview later at the scene, and a more formal interview at a police station—all within in a single day. 982 F. Supp. 2d. 886 (E.D. Wis. 2013). If the Court were to find that Defendant's statements on June 3, 2018, were involuntary or the result of a *Miranda* violation; then the relatively short time between interviews could be relevant as to the admissibility of the June 4, 2018, statements. *See United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012) ("Where the earlier unwarned statements are involuntary, then later statements provided after *Miranda* warnings are admissible only if there is a sufficient break in the stream of events to insulate the second confession from the earlier taint."). However, as discussed in greater detail *infra*, Defendant was not in custody on June 3 and his statements were voluntary. As such, Defendant's argument is a non-starter. *See id.* ("[W]here the previous un-Mirandized statements

10

were nevertheless voluntary, subsequent statements made after *Miranda* warnings are provided are admissible.").

While Defendant also points to the duration of the interview, the June 3, 2018, interview only lasted approximately forty-five minutes. Multiple courts have found that interviewees were not in custody despite being subjected to a longer interview. *See Stechauner*, 852 F.3d at 715-716 ("the [roughly ninety minute] duration of the questioning was relatively short"); *see also Yarborough v. Alvarado*, 541 U.S. 652 (2004) (finding on *habeas* review that a reasonable jurist could find that a roughly two-hour interview did not constitute custody); *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002) ("Further, the duration of his questioning was relatively short (two forty-five-minute periods of questioning).").

Still more, the other factors listed in *Howe* and *Patterson* do not support a finding that Defendant was in custody on June 3, 2018. Again, both Detective Tague and TFO Anderson were in plain clothes, neither unholstered or otherwise showed his weapon, neither handcuffed or otherwise restrained Defendant to his hospital bed, and neither raised his voice. *See United States v. Clark*, 798 F. App'x 5, 8 (7th Cir. 2020) ("[T]he two plain-clothes officers displayed no weapons, and they told Clark that he did not have to talk to them. This kind of interrogation in familiar surroundings lasting under an hour generally weighs in favor of finding that [the suspect] was not in custody." (citations and internal quotation marks omitted)); *United States v. Budd*, 549 F.3d 1140, 1145-46 (7th Cir. 2008) ("Budd agreed that neither officer raised his voice . . . . The officers were dressed in plain clothes and, though carrying sidearms, never made a display of force. Budd was never placed in handcuffs before he was formally arrested and read his *Miranda* rights."). While Defendant was not "released" in the sense that he could walk away at the end of the questions, he was not formally arrested either. Similarly, while Defendant

11

likely could not have physically walked away from the interview, there is nothing to suggest that he could not have otherwise terminated it. *See Stechauner*, 852 F.3d at 715.

Further, it does not appear that Defendant's statements were obtained through coercion. As mentioned, Defendant claims that he only made the statements in question because he "was led to believe that by giving statements he would receive consideration for the statements and would face no more than 10 years in prison." (ECF 45 ¶ 3(b)). Defendant's arguments toe the line between what is suppressible under *Miranda* and what is suppressible under the Fifth Amendment's Due Process Clause more generally.[6] Nevertheless, these arguments are without support in the record.

In analyzing whether an interviewee's statements were coerced or made voluntarily, the relevant question is whether the interviewee's will was overborne. *Schneckloth v. Bustamonte,* 412 U.S. 218, 225-26 (1973). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226. While a "direct or implied promise, however slight," is impermissible, "an interrogator may discuss the possibility of cooperation with the suspect, or may promise to inform the prosecutor of the suspect's cooperation, as long as the interrogator makes it clear he himself has no power to grant immunity or confer benefits." *United States v. Goldstein*, 611 F. Supp. 626, 631 (N.D. Ill. Jun. 17, 1985)

---

[6] Even if there is no evidence suggesting that the statements were coerced, they could be suppressed if they were made absent *Miranda* warnings. *See New York v. Quarles*, 467 U.S. 649, 662 (1984) ("If the *Miranda* warnings were not properly administered or if no valid waiver could be shown, then all responses to interrogation made by the accused 'while in custody ... or otherwise deprived of his freedom of action in any significant way' were to be *presumed* coerced and excluded from evidence at trial." (O'Connor, J., concurring) (omissions in original) (emphasis added) (quoting *Miranda*, 384 U.S. at 476, 479)). Conversely, even if Defendant had waived his privilege against self-incrimination, he could still challenge "whether his statements were 'voluntary' within the meaning of the Due Process Clause." *Id.* at 661.

12

(citing *United States v. Costello*, 750 F.2d 553, 555 (7th Cir. 1984); *United States v. Guido*, 704 F.2d 675, 677 (2d Cir. 1983) (citations and internal quotation marks omitted)).

Courts "analyze coercion from the perspective of a reasonable person in the position of the suspect . . . . [considering] the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment . . . ." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001).

Many of the factors weighing against a finding that Defendant was in custody also weigh against a finding that his statements were coerced. That is, Defendant was not restrained by the officers, the interview was conducted in a calm manner for a relatively short time, and he was not physically restrained or otherwise punished. Further, Defendant had obviously had contact with law enforcement in the past, as evidenced by his statement that he knew TFO Anderson and Special Agent Badowski could not make him any promises having heard it "over and over." (June 4, 2018, Interview at 33:00-34:00).

If it were the case that TFO Anderson misled Defendant as to his potential criminal exposure, this would potentially be grounds for suppressing Defendant's statements. *See Goldstein*, 611 F. Supp. at 632 ("What is at issue here is not the government's failure to inform Goldstein, but rather its deliberate *misrepresentations* to Goldstein of his status. And when the government misleads a suspect concerning the consequences of a confession, his statements are regarded as having been unconstitutionally induced by a prohibited direct or implied promise."); *see also United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009) ("An empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose." (citation

13

omitted)).  Defendant, however, began to speak about the gun at issue in this case after TFO Anderson correctly explained to him the penalty for lying to a federal investigator (June 3, 2018, Interview at 08:15-9:45), not after he was told of his potential sentence for possessing a sawed-off shotgun (June 3, 2018, Interview at 30:40-31:15).[7]  Because Defendant's statements regarding this charge were elicited before TFO Anderson even mentioned Defendant's potential exposure, it is hard to see how this presented Defendant with a false choice or otherwise deliberately misled him.  *See United States v. Stewart*, No. 05-CR-216, 2006 WL 83128, at *8 (E.D. Wis. Jan. 11, 2006) ('Lauda did inform Stewart of the crime he was investigating . . . and the possible penalties, and also cautioned her that lying to the police is a crime, but such does not constitute coercion.").  Further, while TFO Anderson did tell Defendant he faced a potential ten-year charge, there is nothing to suggest this was a deliberate misrepresentation.  Rather, TFO Anderson's hearing testimony suggests that he was not aware of Defendant's armed career criminal status—and therefore his longer potential sentence—until the following day.  (Tr. 35).

      Defendant's references to his injury and medication are similarly unpersuasive.  First, there is no evidence in the record suggesting that Defendant was on any sort of medication that clouded his judgment to the extent that his will was overborne.  While it certainly seems likely that Defendant was on some kind of pain medication, "[s]imply taking pain medication administered by a hospital does not involve coercive *police* activity."  *Stechauner*, 852 F.3d at 718; *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . .").  In any event, the record suggests that Defendant was cognizant and able to make decisions.  After all, Defendant

---

[7] While TFO Anderson and Defendant continued to speak after TFO Anderson stated that Defendant faced a "ten-year charge," they primarily spoke about Defendant's involvement with a separate criminal investigation.  (June 3, 2018, Interview at 30:30-47:08).

14

was clearly able to appreciate the fact that TFO Anderson believed that he was initially lying and was also able to carry on a conversation, discussing various events and people. *See United States v. Wilford*, No. 07-30109-WDS, 2008 WL 108941, at *3 (S.D. Ill. Jan. 9, 2008) ("The Court's review of the video reveals that the defendant simply does not appear, nor act as if he was suffering from any overborne will, or the ill effects of any pain medication. He was cogent, appropriately responsive, he joked with the officers, asked pertinent questions, and was able to detail his involvement in the events surrounding the armored car robbery."). Further "a diminished mental state due to the effects of alcohol or drugs 'is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective.'" *United States v. Thomas*, 39 F. Supp. 3d 1015, 1023 (N.D. Ill. 2014) (quoting *United States v. Chrismon,* 965 F.2d 1465, 1469 (7th Cir. 1992)). As discussed above, though, the evidence does not suggest that the police engaged in any improper mentally or physically coercive behavior.

In summary, considering the totality of the circumstances, I find that Defendant was not in custody on June 3, 2018, while interviewed by TFO Anderson and Detective Tague. Further, Defendant's statements to the officers were not a result of coercion. Accordingly, Defendant's statements made on June 3, 2018, should not be suppressed.

*2. June 4, 2018, Interview*

Turning next to the June 4, 2018, interview, TFO Anderson testified, and the audio recording confirms, that he did in fact read Defendant his *Miranda* rights. (Tr. 50; June 4, 2018, Interview at 03:30-4:30). The Government contends that Defendant again was not in custody for purposes of *Miranda*, but even if he was, Defendant knowingly waived his rights when he decided to speak with TFO Anderson. (ECF 68 at 20). Defendant primarily contends that he did not knowingly waive his *Miranda* rights and any such waiver was the result of coercion. (ECF

15

69 at 3). "[W]hether a person in custody knowingly and voluntarily waives his *Miranda* rights depends upon the totality of the circumstances." *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002). "In evaluating whether a suspect voluntarily waived his *Miranda* rights, [the Court considers] the same factors that [it] considered above in assessing the overall voluntariness of a confession." *Ruvalcaba v. Chandler,* 416 F.3d 555, 562 (7th Cir. 2005) (citations omitted). A defendant's waiver of his *Miranda* rights may be explicit or implicit. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("[A] waiver of *Miranda* rights may be implied through a defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." (internal citation and quotation marks omitted)).

Here, many of the factors tending to show that Defendant was not in custody and that his statements were voluntary on June 3, 2018, were present again on June 4, 2018. Again, the questioning officers were in plain clothes, neither unholstered his firearm, and neither raised his voice. At no point was Defendant handcuffed or otherwise restrained to the bed. Further, the June 4 interview was even shorter in duration than the June 3 interview—lasting roughly 35 minutes. Again, while Defendant was likely on one or more pain medications, there is nothing to suggest that this was the result of police action, nor is there anything to suggest that Defendant was unable to appreciate what was happening. Defendant was still able to coherently and cogently respond to TFO Anderson's questions, remember what he had told the police the day before, and understand what was being asked of him. The officers also again made it clear that they could not make Defendant any promises, which Defendant indicated he knew and understood. While it is still unclear whether Defendant had the physical ability to walk away from the interview, there is still nothing to suggest that he could not have otherwise terminated it.

16

As such, the record suggests that Defendant was not in custody for the purposes of *Miranda* and that his statements were voluntary.

In any event though, Defendant implicitly waived his *Miranda* rights before proceeding to speak with TFO Anderson.  As mentioned, TFO Anderson read Defendant his *Miranda* rights, and Defendant indicated he understood those rights and did not have any questions, before proceeding to speak with the officers.  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*  Further, Defendant offered no testimony otherwise suggesting that he was unable to provide a knowing waiver.  *See United States v. Schwensow*, 151 F.3d 650, 660 (7th Cir. 1998) ("Schwensow offers us no reason to reject the district court's factual conclusion that he validly waived his *Miranda* rights prior to Detective Benish's December 1, 1995 interviews.  At the suppression hearing, the court heard believable testimony from Detective Benish that Schwensow gave no indication of being impaired, and unbelievable testimony from Schwensow that delirium tremens, blackouts, and hallucinations caused by alcohol withdrawal and Ativan prevented a knowing and intelligent waiver.") (finding that the defendant knowingly waived his *Miranda* rights).

In summary, Defendant was not in custody for purposes of *Miranda* on June 4, 2018.  Further, even if he was, the evidence suggests that he made a knowing and voluntary waiver of his *Miranda* rights.  Still more, I find that Defendant's statements were made voluntarily and were not the result of improper police coercion.  Accordingly, Defendant's statements made on June 4, 2018, should not be suppressed.

17

*E. Conclusion*

For the above reasons, I CONCLUDE that Defendant was not in custody during the June 3, 2018, and June 4, 2018 interviews, and his statements made in each were voluntary. I therefore RECOMMEND that Defendant's motion to suppress (ECF 45) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Entered this 28th day of July 2020.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge